

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

**MAY 0 1 2018**

Sherri R. Carter, Executive Officer/Clerk

By Shaumya Bolden, Deputy

Michael D. Resnick (SBN 245215)
e-mail: mresnick@clrattorney.com
Neil Gieleghem (SBN 107389)
e-mail: ng@clrattorney.com
**Consumer Legal Remedies, APC**
153 ½ North Arnaz Drive
Beverly Hills, CA 90211
Telephone: (310) 213-1398
Facsimile: (213) 210-2196

Attorneys for Plaintiffs,
RYAN WALSH and JOHN WALSH

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES – UNLIMITED JURISDICTION

| | |
|---|---|
| RYAN WALSH and JOHN WALSH,<br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY; PENSKE FORD; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case Nos.:<br><br>**BC 7 0 4 3 2 0**<br><br>Hon.:<br>Dept.:<br><br>**COMPLAINT FOR VIOLATION OF STATUTORY OBLIGATIONS**<br><br>JURY TRIAL DEMANDED |

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

COPY

Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      Broadly stated, this lawsuit is a "Lemon Law" case based on defective "DPS6 PowerShift" transmissions that Defendant Ford Motor Company installed in Focus and Fiesta model cars between 2012 and 2016. These transmissions were defectively designed and defectively manufactured, and failed to operate as Ford represented to consumers. Ford, however, continued to install these defective transmissions in Focus and Fiesta cars, even though Ford knew of their defects. Even worse, Ford repeatedly lied to consumers as to the reasons for the problems consumers experienced. As a result, consumers were and are "stuck" in unsafe Focus and Fiesta autos that have minimal resale value due to the transmission defects, which have been widely published. Due to the defects in the transmissions, Ford's failure to remedy those problems, and Ford's fraud on consumers, Plaintiffs have been forced to join the ranks of tens of thousands of consumers who have sued Ford in California and other courts nationwide.

2.      As used in this Complaint ("Complaint"), the word "Plaintiffs" shall refer to Plaintiffs RYAN WALSH and JOHN WALSH.

3.      Plaintiffs are residents of San Diego County, California.

4.      As used in this Complaint, the word "Defendant" shall refer to all Defendants named in this Complaint.

5.      Defendant Ford Motor Company ("Ford") is a corporation organized and in existence under the laws of the State of Delaware and registered with the California Department of Corporations to conduct business in California. At all times relevant herein, Ford was engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in Los Angeles County and other locations within California.

6.      Defendant PENSKE FORD is a business entity, form unknown, conducting business in the State of California. At all times relevant herein, Defendant PENSKE FORD was a motor vehicle dealership certified and authorized by Ford to engage in the business of selling

CONSUMER LEGAL REMEDIES, APC

1   Ford automobiles and automobile components, and the servicing and repairing of Ford
2   automobiles in San Diego County.

3       7.      The causes of action to this Complaint arise out of the warranty obligations of
4   Ford for a vehicle purchased by Plaintiffs and for which Ford issued a written warranty.
5   Plaintiffs also allege that Ford concealed a known defect from Plaintiffs: A defective component
6   known as the "DPS6 PowerShift Transmission" (hereinafter "PowerShift Transmission"). This
7   Powershift Transmission is installed by Ford in its 2011-2015 "Fiesta" model automobiles, and
8   its 2012-2015 "Focus" model automobiles. As detailed below, Ford also misrepresented to
9   Plaintiffs the workings, performance, and reliability of said PowerShift Transmission.

10      8.      Plaintiffs are ignorant of the true names and capacities of the Defendants sued
11  under the fictitious names DOES 1 to 10, and said DOES are sued pursuant to Code of Civil
12  Procedure section 474. When Plaintiffs become aware of the true names and capacities of the
13  Defendants sued as DOES 1 to 10, Plaintiffs will amend this Complaint to state their true names
14  and capacities.

15      9.      All acts of corporate employees as alleged were authorized or ratified by an
16  officer, director or managing agent of the corporate employer.

17      10.     Each Defendant whether actually or fictitiously named herein, was the principal,
18  agent, (actual or ostensible), or employee of each other Defendant and in acting as such principal
19  or within the course and scope of such employment or agency, took some part in the acts and
20  omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the
21  relief prayed for herein.

22      11.     On or about May 05, 2017, Plaintiffs purchased a 2013 Ford Fiesta vehicle,
23  Vehicle Identification Number 3FADP4EJ3DM208243, (hereafter the "Vehicle") which was
24  manufactured and/or distributed by Defendant. Express warranties accompanied the sale of the
25  Vehicle to Plaintiffs by which Ford undertook to preserve or maintain the utility or performance
26  of Plaintiffs' Vehicle or provide compensation if there was a failure in such utility or
27  performance. The Vehicle was purchased or used primarily for personal, family, or household
28  purposes.

COMPLAINT; JURY TRIAL DEMANDED

CONSUMER LEGAL REMEDIES, APC

12.     The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to a defective transmission as detailed, *infra*.

### The PowerShift Transmission Defect

13.     The Vehicle was manufactured by Ford and delivered to Plaintiffs with a PowerShift Transmission. Ford offered the PowerShift Transmission as the sole "automatic transmission" option in the Vehicle.

14.     Contrary to Ford's option description, the PowerShift Transmission is neither a conventional automatic transmission, nor a conventional manual transmission. Instead, the Powershift Transmission is a "computer-automated" manual transmission.

15.     Conventional manual transmissions use a driver-controlled clutch, typically by way of a clutch foot pedal. By depressing and releasing this clutch foot pedal, the driver causes the clutch mechanically to engage and disengage the engine from the transmission, which allows the vehicle to continue to travel while the driver manually changes gears. Because such a clutch mechanism allows for transfer of virtually all of the engine's power to the transmission, a properly designed and operating manual transmission is highly efficient. However, proper operation of a manual transmission can be difficult for less-experienced drivers and can result in the vehicle jerking or shuddering improper operation. As a result, conventional manual transmissions are disfavored by some consumers.

16.     In contrast, conventional automatic transmissions relieve the driver from operating the clutch, typically through the use of a fluid-filled device called a torque converter. The torque converter substitutes for the manual transmission's clutch, transmitting power from the engine to the transmission through a fluid medium. While automatic transmissions offer increased comfort and convenience, they are generally less fuel efficient, and are slower-shifting, than manual transmissions, because the torque converter transfers power through fluid less efficiently than a mechanical clutch.

17.     Due to these marketing/customer preference and engineering constraints, Ford marketed and sold its PowerShift Transmission as an "automatic transmission" that offered the

CONSUMER LEGAL REMEDIES, APC
15312 SOUTH ABSECON BLVD., BEVERLY HILLS CA 90211

"*Best of Both Worlds*" – e.g., a combination of a manual transmission's efficiency and fuel economy with an automatic transmission's ease of operation and driver convenience. Consistent with this, Ford internally refers to the Powershift Transmission as the "DPS6 automatic transmission."

18.    In truth, the PowerShift Transmission, despite Ford's representations to consumers, is a manual transmission in terms of it having a clutch that must be disengaged to shift gears. The Powershift Transmission has no torque converter; instead, it uses two mechanical clutches to engage/disengage the engine from the transmission. In turn, the engagement and disengagement of the two clutches, and the shifting of the gears, is controlled by "Transmission Control Modules" ("TCMs"). These TCMs are programmable computers that process information from various sensors that monitor the vehicle's condition and driving conditions (e.g., engine R.P.M.; load), and shift gears based on the TCM's programming. Further, whereas similar "automated manual" transmissions on the market use ''wet'' clutches bathed in oil, Ford's PowerShift Transmission clutches operate "dry" and lack the oil pumps and other components of a wet clutch system.

19.    Ford designed the PowerShift Transmission in an effort to meet heightened governmental and consumer expectations for fuel economy, performance, convenience, and efficiency. Ford designed and marketed its PowerShift Transmission as a more advanced and fuel-efficient automatic transmission. According to Ford's press release dated March 10, 2010, "PowerShift, with dry-clutch facings and new energy-saving electromechanical actuation for clutches and gear shifts saves weight, improves efficiency, increases smoothness, adds durability and is sealed with low-friction gear lubricant for the life of the vehicle. The transmission requires no regular maintenance."

20.    In theory, a computer-controlled, automated manual transmission may provide the convenience of an automatic transmission without sacrificing the fuel efficiency and shift speed of a manual transmission. In practice however, Ford's PowerShift Transmission is plagued by numerous problems and safety concerns.

21.    Plaintiffs are informed and believe, and based thereon allege, that the PowerShift

CONSUMER LEGAL REMEDIES, APC
3535 E. NORTH HIGH HILL WOODLAND HILLS, CALIFORNIA

Transmission is defective in its design and/or manufacture. This can result in various problems, including, but not limited to, sudden acceleration, delayed acceleration, hesitation on acceleration, difficulty stopping the vehicle, jerking, bucking and kicking, shuddering on acceleration, lack of power, delayed downshifts, transmission fluid leaks, and/or premature wear of the internal components (collectively, the "Transmission Defect").

22.     The Transmission Defect causes unsafe conditions in vehicles equipped with the PowerShift Transmission, including, but not limited to suddenly lurching forward, delayed acceleration, and sudden loss of forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. For example, these conditions make it difficult to safely merge into traffic. Even more troubling, the Transmission Defect can cause the vehicle to fail to downshift and decelerate when the brake pedal is depressed. Instead, the PowerShift Transmission continues to transfer power to the transmission, and even surges the engine's R.P.M.s. As a result, drivers of vehicles equipped with the PowerShift Transmission have reported their vehicles lurching forward into intersections at red lights despite their braking efforts to stop the car.

23.     On information and belief, the Transmission Defect also causes premature wear to the PowerShift Transmission's clutch plates and other components, which results in premature transmission failure and requires expensive repair, including premature transmission replacement.

24.     As early as 2010, Ford knew or should have known that the PowerShift Transmission contained one or more design and/or manufacturing defects that negatively affect drivability and caused safety hazards.

25.     Plaintiffs are informed and believe, and based thereon allege, that prior to the sale of the Vehicle, Ford knew, or should have known about the Transmission Defect through its exclusive knowledge of non-public internal data about the Transmission Defect, including: pre-releasing testing data; early consumer complaints about the Transmission Defect to Ford's dealers who are Ford's agents for vehicle repairs; dealership repair orders; testing conducted in response to those complaints; "Technical Service Bulletins" ("TSBs") developed by Ford and

communicated to its dealers and authorized repair facilities; the existence of substantially identical defects in substantially identical European and Australian model vehicles released prior to Ford's marketing and sale of the PowerShift Transmission domestically; and other internal sources of information possessed exclusively by Ford and its agents. Nevertheless, Ford and its agents have actively concealed the Transmission Defect, and failed to disclose this defect to Plaintiffs at the time of purchase of the Vehicle and thereafter.

26.     Before offering vehicles equipped with the PowerShift Transmission in the United States, Ford offered substantially identical vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia, albeit with wet clutches (i.e., clutches bathed in oil, as described above). Although the domestic version of the PowerShift Transmission utilizes dry clutches as opposed to the European and Australian version's wet clutches, Ford acknowledges that the PowerShift Transmission offered for sale in the United States is "derivative" of the design from the European and Australian models. This is significant, as the European and Australian versions of the dual-clutch transmission suffered from defects and performance issues similar to the Transmission Defects in the Powershift Transmission known to Ford as alleged herein.

27.     In addition to obtaining years of feedback and testing from its European and Australian dual-clutch transmission, according to Ford, its team:

...logged approximately three years or 6,000 man-hours of computer aided mathematical modeling, simulation and analysis of engine speeds, torque and clutch capacity in only 24 months real time to prove the THF concept was production ready.

28.     In addition, Ford boasted about its extensive testing of the vehicle in its marketing brochures that were publicly distributed:

Obsessive was the starting point. You'll enjoy every drive because Focus engineers obsessed over every last detail. Focus was thoroughly tested in an assortment of harsh environments and situations to make sure you get a car beyond your wildest imagination.

CONSUMER LEGAL REMEDIES, APC

29.     The PowerShift Transmission uses a program called "Torque Hole Filling" ("THF"), which is a combination of computer algorithms and computer-aided tools to fill the "torque hole," which is commonly perceived as hesitation while shifting. To promote sales, Ford claims its THF technology would create a smoother-driving experience for the customer.

30.     Despite these claims, consumers have not experienced a smoother driving experience from·THF, or from any other technology incorporated in the PowerShift Transmission. Multiple reviews in automotive journals and customer complaints have documented and confirmed that the PowerShift Transmission has continuously exhibited the Transmission Defect malfunctions, maladjustments, and nonconformities of which Plaintiffs now complain.

31.     For example, in a 2011 New York Times review of the Ford Focus, the reviewer stated that "Ford programmed the PowerShift Dual-clutch transmission to change gears in odd and infuriating ways" and that "[t]he transmission is often in the wrong gear at the wrong time, resulting in jerks, pauses and lethargic acceleration."

32.     In response to these criticisms, Greg Burgess, an engineer at Ford, conceded in the same New York Times article that "[i]t is quite a challenge to deliver something that is very, very fuel efficient and yet feels like a conventional automatic, and there are some balances and some trade-offs that we make."

33.     In response to complaints about the Transmission Defect, in 2010 and 2011, Ford issued several Technical Service Bulletins ("TSBs") to its dealers and authorized repair facilities acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010 covering the 2011 Ford Fiesta, informed dealers and service personnel of "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or check engine light with transmission control module (CM) diagnostic trouble code . . . . "

34.     Similarly; Ford's TSB released on January 1, 2011, covering the·2011 Ford Fiesta with the PowerShift Transmission, informed dealers and service personnel of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle

7.

1    response while driving."

2        35.    Ford's TSB from March 31, 2011 also covering the 2011 Ford Fiesta informs

3    dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in

4    reverse only."

5        36.    Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta.

6    These TSBs addressed problems with the PowerShift Transmission including "concerns in

7    Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed

8    engagement, intermittent engagement, noise during engagement . . . ."

9        37.    Another Ford TSB released in September 2011 advised dealers to reprogram the

10   transmission computer if 2011 Ford Fiesta owners complained about "hesitation when

11   accelerating from a low speed after coast down, harsh or late upshift, harsh shifting during low-

12   speed tip-in or tip-out maneuvers and/or engine r.p.m. flare when coasting to a stop."

13       38.    The 2011 Ford Focus also was the subject of a September 2011 Ford TSB, which

14   informed dealers and service personnel of transmission problems including: "RPM flare on

15   deceleration coming to a stop, rough idle on deceleration coming to a stop, intermittent engine

16   idle fluctuations at a stop, intermittent vehicle speed control inoperative, intermittent harsh

17   engagement/shift . . . ."

18       39.    In May of 2012, Ford issued a "Customer Satisfaction Program: Program

19   Number 12837." In a letter sent to 2012 Ford Focus drivers, Ford indicated that drivers "may

20   experience rough or jerky automatic transmission shifts. In addition, the vehicle may experience

21   roll back when the driver is transitioning from the brake pedal to the accelerator pedal while on

22   a slight incline." Significantly, Ford did not issue a recall and did not warn drivers of the safety

23   risks associated with these known problems.

24       40.    Because Ford will not notify the public that the PowerShift Transmission is

25   defective, Plaintiffs (as well as members of the public) are subjected to dangerous driving

26   conditions that often occur without warning.

27       41.    Ford knew about, and concealed, the Transmission Defect present in the Vehicle,

28   along with the Transmission Defect's attendant dangerous safety and drivability problems, from

CONSUMER LEGAL REMEDIES, APC
15315 NORTH ABSACO DRIVE, BEVERLY HILLS, CA 90211

Plaintiffs at the time of sale, repair, and thereafter. In fact, instead of repairing the defects in the PowerShift Transmission, Ford either refused to acknowledge their existence (for example, instructing service personnel at Ford dealers to communicate to customers that symptoms caused by the Transmission Defect were "normal" or "normal operating characteristics" of the transmission), or performed superficial and ineffectual software upgrades that simply masked the symptoms of the Transmission Defect.

42. If Plaintiffs knew about these defects at the time of sale, Plaintiffs would not have purchased the Vehicle or would have paid substantially less for it.

43. As a result of Plaintiffs' reliance on Ford and its agent's omissions and/or misrepresentations, Plaintiffs suffered an ascertainable loss of money, property, and value to the Vehicle. Additionally, as a result of the Transmission Defect, Plaintiffs were harmed and suffered actual damages in that the Vehicle's transmission is substantially certain to fail before its expected useful life has run.

### Ford Had Exclusive Knowledge of the Transmission Defect

44. Ford had superior and exclusive knowledge of the Transmission Defect, and knew or should have known that the Transmission Defect was not known or reasonably discoverable by Plaintiffs, before Plaintiffs purchased the Vehicle.

45. Plaintiffs are informed and believe, and based thereon allege, that before Plaintiffs purchased the Vehicle, and since at least 2010, Ford knew about the Transmission Defect through sources not available to consumers, including pre-release testing data, early consumer complaints about the Transmission Defect to Ford and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, aggregate data from Ford dealers, among other internal sources of aggregate information about the Transmission Defect including, but not limited to, similar defects in the substantially identical European and Australian models.

46. Before the Vehicle was available for sale in the United States, Ford offered the same vehicles, equipped with a similar dual-clutch transmission, in Europe and Australia. Although the United States version utilizes dry clutches as opposed to the European and

CONSUMER LEGAL REMEDIES, APC
1551/2 NORTH ARNAZ PKWY, BEVERLY HILLS CA 90211

9

Australian version's wet clutches, Ford acknowledged in its own press release that the PowerShift Transmission offered for sale in the United States is a "derivative" of the design of the European and Australian models. European and Australian versions of the dual-clutch transmission suffered from similar defects as alleged herein.

47. In addition to having access to years of analysis and feedback concerning the prior dual-clutch design, Ford also acknowledged in its own press releases the extensive pre-release testing and computer aided modeling, simulation, and analysis it conducted before bringing the PowerShift Transmission to the United States market.

48. Ford was also aware of the Transmission Defect through the numerous complaints it received, both from consumers and from automotive journalists, who roundly criticized the performance of the PowerShift Transmission. Indeed, a July 15, 2011 New York Times review of the Ford Focus criticized the PowerShift transmission's "jerks, pauses and lethargic acceleration." In that same article, Greg Burgess, a Ford engineer, admitted that Ford made "trade-offs" in terms of drivability in order to "deliver something that is very, very fuel efficient."

49. The review went on to state: "the logical explanation is that they [the Ford Engineers] were given a fuel economy target and no option but to meet it. One might wonder why a top executive didn't step in to keep the transmission from reaching market."

50. The existence of the Transmission Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle equipped with a PowerShift Transmission. Had Plaintiffs known that the Vehicle was equipped with a defective transmission, they would not have purchased the Vehicle equipped with the PowerShift Transmission or would have paid substantially less for it.

51. Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's transmission is safe, will function in a manner that will not pose a safety hazard, and is free from defects. Plaintiffs further reasonably expect that Ford will not sell or lease vehicles with known safety defects, such as the Transmission Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Ford to fail to disclose the Transmission

Defect to them and to continually deny the defect.

### Ford's Failure to Disclose the PowerShift Transmission Defect

52. Ford has never disclosed the Transmission Defect to Plaintiffs prior to the purchase of the Vehicle or at any point during ownership of the Vehicle, and Ford has never instructed its dealerships to disclose the Transmission Defect to drivers or potential purchasers or lessees of vehicles equipped with the PowerShift Transmission.

53. The Transmission Defect was not known or reasonably discoverable by Plaintiffs before they purchased the Vehicle; or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

54. Ford has remained silent even as it issued service bulletins, conducted internal investigations, and witnessed the failure of the transmission in earlier models of their vehicles distributed in Europe and Australia.

55. Ford's refusal to publicly acknowledge the Transmission Defect created widespread confusion. Ford's failure to notify consumers, dealerships, or auto-technicians prevents the PowerShift Transmission problem from being efficiently diagnosed. Drivers are led to believe that the problems they are experiencing with the transmission in their vehicle are actually "normal characteristics" of the transmission. Likewise, the lack of information makes it less likely that dealerships and auto technicians will be able to diagnose and fix and document the Transmission Defect or advise Plaintiffs about the dangers of driving the Vehicle.

56. As a result of Ford's inaction and silence, Plaintiffs were entirely unaware that they purchased and continued to drive, an unsafe and unreliable vehicle. As Ford knows, a reasonable person would consider the Transmission Defect important and would not purchase or lease a vehicle equipped with the Transmission Defect were the defect disclosed in advance or would pay substantially less for the vehicle.

### Ford Has Actively Concealed the Transmission Defect

57. While Ford has been fully aware of the Transmission Defect affecting the Vehicle, Ford and its agents actively concealed the existence and nature of the Transmission Defect from Plaintiffs at the time of purchase, repair, and thereafter. Specifically, Ford failed to

CONSUMER LEGAL REMEDIES, APC
1551 N. TUSTIN AVE., SUITE 1150, SANTA ANA, CA 92717

disclose or actively concealed at and after the time of purchase or repair:

a. any and all known material defects or material nonconformity of the Vehicle, including the Transmission Defect in the PowerShift Transmission;

b. The Vehicle and its PowerShift Transmission, were not in good working order, were defective, and were not fit for the intended purposes; and

c. The Vehicle and its PowerShift Transmission were defective, despite the fact that Ford learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources as early as 2010.

58. As a result of the Transmission Defect, Ford was inundated with complaints regarding the PowerShift Transmission. In July 2011, Ford implemented a communications strategy intended to enlighten consumers about some of the behavior characteristics of the PowerShift Transmission in order to "improve customer expectations." In a memo with instructions sent to Ford dealers and service personnel, which Ford intended its dealers and service personnel to communicate to consumers, Ford noted that some of the common and normal characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine.

59. However, despite Ford's public insistence that these behavioral characteristics of the PowerShift Transmission were normal, in 2010 and 2011, Ford issued several TSBs to its dealers in the United States acknowledging defects in the PowerShift Transmission. Ford's TSB from September 2010, covering the 2011 Ford Fiesta, informs dealers how to address and attempt to repair the PowerShift Transmission in response to "concerns such as no engagement or intermittent no engagement in Drive or Reverse when shifting from Park to Drive or Reverse, grinding noise during engagement, and/or a check engine light with transmission control module (TCM) diagnostic trouble code . . . ."

60. Ford's TSB released on January 1, 2011, covering the 2011 Fiesta with the PowerShift Transmission, informs dealers of problems with the PowerShift Transmission causing "a loss of power, hesitation, surge, or lack of throttle response while driving."

61. Ford's TSB from March 31, 2011, also covering the 2011 Ford Fiesta, informs

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARROGO DRIVE, BEVERLY HILLS, CA 90211

1    dealers of problems where the PowerShift Transmission "exhibit[s] a rattle/grind noise in

2    reverse only."

3         62.    Ford issued two separate TSBs in May 2011, both covering the Ford Fiesta.

4    These TSBs addressed problems with the PowerShift Transmission including "concerns in

5    Drive or Reverse when shifting from Park to Drive or reverse, no engagement, delayed

6    engagement, intermittent engagement, noise during engagement . . . ."

7         63.    On information and belief, another Ford TSB released in September 2011

8    advised dealers to reprogram the transmission computer if 2011 Fiesta owners complained about

9    "hesitation when accelerating from a low speed after coast down, harsh or late 1-2 upshift, harsh

10   shifting during low-speed tip or tip-out maneuvers and/or engine r.p.m. flare when coasting to

11   a stop."

12        64.    The 2012 Ford Focus was the subject of a Ford TSB in September 2011, which

13   informed dealers of transmission problems including: "RPM flare on deceleration coming to a

14   stop. Rough idle on deceleration coming to a stop, intermittent engine idle fluctuations at a stop,

15   intermittent vehicle speed control inoperative, [and] intermittent harsh engagement/shift . . . ."

16        65.    In December of 2011, Motor trend magazine called these efforts by Ford a

17   "stealth upgrade" and noted that while "[t]here's no official recall or service campaign . . . .

18   anybody who complains or requests an upgrade at the dealership can have their powertrain

19   control computer re-flashed."

20        66.    On information and belief, the software upgrades recommended and encouraged

21   by the various TSBs issued by Ford were completely ineffective at addressing the Transmission

22   Defect.

23        67.    When consumers present vehicles equipped with the PowerShift Transmission to

24   an authorized Ford dealer for repair to the transmission, rather than inform consumers of the

25   Transmission Defect or conclusively repair the problem under warranty, Ford's dealers and

26   authorized repair facilities either inform consumers that their vehicles are functioning properly,

27   or perform superficial and ineffectual software updates that delay or mask the manifestation of

28   the Transmission Defect in an attempt to avoid more comprehensive and expensive repair or

CONSUMER LEGAL REMEDIES, APC
1553 1/2 NORTH AROSS DRIVE, BEVERLY HILLS, CA 90211

13

1  replacements under the warranty.

2      68.    To this day, Ford still has not notified Plaintiffs that the Vehicle suffers from a

3  systemic defect that causes the transmission to malfunction.

4  All Statute of Limitations Periods are Tolled by the Discovery Rule and the Doctrine of

5  Fraudulent Concealment

6      69.    Ford misrepresented the qualities of the PowerShift Transmission in the Vehicle

7  to Plaintiffs at the time of the sale of the Vehicle. Ford also concealed the fact that the PowerShift

8  Transmission was defective.

9      70.    Ford continued to misrepresent its ability to repair the Vehicle in conformity with

10  the warranty throughout the warranty period.

11      71.    At all relevant times, Ford was aware of the defects in the PowerShift

12  Transmission.

13      72.    As described in more detail, *supra*, as early as 2010, Ford began issuing significant

14  technical service bulletins to its authorized dealers explaining the widespread issues with the

15  PowerShift Transmission. At no point prior to the sale of the Vehicle to Plaintiffs or during

16  Plaintiffs' ownership of the Vehicle did Ford or an authorized dealer ever inform Plaintiffs of the

17  ongoing defect or the fact that Plaintiffs' Vehicle was not actually equipped with an automatic

18  transmission.

19      73.    Ford had a duty to disclose the concealed facts alleged above because Ford knew

20  that Plaintiffs did not know a material fact and further knew that such facts were not readily

21  accessible to Plaintiffs because Ford actively concealed those facts.

22      74.    Ford had a duty to disclose the concealed facts alleged above because Ford made

23  misrepresentations in its marketing materials and window stickers and through its authorized sales

24  representatives about the quality, characteristics, and safety of the PowerShift Transmission.

25      75.    Ford had a duty to disclose the concealed facts alleged above because Ford actively

26  concealed material facts in order to induce a false belief.

27      76.    Ford intended for Plaintiffs to rely on those misrepresentations to conceal the fact

28  that the defective PowerShift Transmission could not be repaired.

14

CONSUMER LEGAL REMEDIES, APC
153 123 North Alexander, Beverly Hills, CA 90211

77. Prior to the sale of the Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the Vehicle's inherent defects to Plaintiffs, and Defendant failed to disclose its inability to repair these inherent defects, which prevented the Vehicle from conforming to its applicable warranties. In effect, after the sale of the Vehicle, Defendant fraudulently concealed from purchasers and lessees, including Plaintiffs, the fact that the dealers were not properly repairing the defects to the PowerShift transmission, and knew that the limited work that Ford had authorized its dealerships to perform on those vehicles would not properly repair them. Ford also continued to conceal the fact that Plaintiffs' Vehicle was not in fact equipped with an automatic transmission as advertised.

78. Because Ford failed to disclose these foregoing facts to Plaintiffs, all statute of limitations periods with respect to the sale of the Vehicle were tolled by the doctrines of fraudulent concealment, the delayed discovery rule, and/or equitable tolling. As alleged herein. Ford wrongfully concealed the fact:

1) that the Vehicle was equipped with a manual transmission (the PowerShift Transmission), and

2) that its dealerships were making inadequate repairs that were incapable of addressing the root cause of the Vehicle's malfunctions.

79. Plaintiffs did not discover the operative facts that are the basis of the claims alleged herein because the facts were concealed in confidential and privileged documents, which a consumer would not know about and could not obtain.

80. No amount of diligence by Plaintiffs could have led to the discovery of these facts because they were kept secret by Ford and therefore, Plaintiffs were not at fault for failing to discover these facts.

81. Plaintiffs did not have actual knowledge of facts sufficient to put them on notice. Plaintiffs did not know, or could have known, about Ford's inability to repair the defects in its PowerShift Transmission because, as alleged above, Ford kept this information highly confidential, and its dealership assured Plaintiffs that its repairs were effective.

All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Vargas v. Ford Motor Company*

82.     Plaintiffs gave timely notice of Plaintiffs' claims against Ford in the present action as a putative class member in a class action, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was filed on September 28, 2012. That action was filed within three years of the date of Plaintiffs' discovery of their claims against Ford in the present action, as previously described in detail above.

83.     There is no prejudice to Ford in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the class action complaint within which Plaintiffs were a putative class member and the allegations in the class action lawsuit, *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiffs' individual action, the witnesses necessary for Ford to defend Plaintiffs' individual action, and the causes of action against Ford asserted in Plaintiffs' individual action.

84.     *Vargas v. Ford Motor Company*, United States District Court, Central District of California Case No. 2:12-cv-08388 ABC (FFMx), alleged the same or substantially similar material facts on behalf of Plaintiffs as a putative class member as are being alleged by Plaintiffs in the present individual action.

85.     The facts alleged in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ·ABC (FFMx),·are substantially similar, if not identical to the facts alleged herein.

86.     The allegations in *Vargas v. Ford Motor Company*, United States District Court, Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), are based on the same subject matter and similar evidence as the instant Complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant Complaint.

87.     The *Vargas* class action certainly protected. the efficiency and economy of

16

1 litigation because that class action is protecting the rights of thousands of consumers nationwide

2 through a single action. Consumer class actions regarding defective vehicles brought against

3 manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing

4 such claims.

5      88.    The tolling of Plaintiffs' individual statute of limitations encourages the protection

6 of efficiency and economy in litigation as promoted by the class action devise, so that putative

7 class members would not find it necessary to seek to intervene or to join individually because of

8 fear the class might never be certified or putative class members may subsequently seek to request

9 exclusion.

10      89.    The running of all statute of limitations on each of Plaintiffs' claims asserted

11 against Ford in the present action were therefore tolled under the tolling doctrine established by

12 *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 during the entire pendency of

13 the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed on

14 September 28, 2012 to the date on which Plaintiffs filed the instant action).

15 <u>All Statute of Limitations Periods are Tolled By The California Doctrine of Equitable Tolling</u>

16 <u>as a Result of the Class Action *Vargas v. Ford Motor Company*</u>

17      90.    Plaintiffs gave timely notice of Plaintiffs' claims against Ford in the present action

18 as a putative class member in a class action, *Vargas v. Ford Motor Company*, United States

19 District Court. Central District of California, Case No. 2:12-cv-08388 ABC (FFMx), which was

20 filed on September 28, 2012. That action was filed within three years of the date of Plaintiffs'

21 discovery of their claims against Ford in the present action, as previously described in detail

22 above.

23      91.    There is no prejudice to Ford in gathering evidence to defend against Plaintiffs'

24 individual claims because the class definition in the class action complaint within which Plaintiffs

25 were a putative class member and the allegations in the class action lawsuit, *Vargas v. Ford Motor*

26 *Company*, United States District Court, Central District of California, Case No 2:12-cv-08388

27 ABC (FFMx), put Ford on notice of the facts that give rise to Plaintiffs' individual action, the

28 witnesses necessary for Ford to defend Plaintiffs' individual action, and the causes of action

CONSUMER LEGAL REMEDIES, APC
333 1/2 NORTH BRAND BLVD, BURBANK, CA 91211

17

1  against Ford asserted in Plaintiffs' individual action.

2  92.  *Vargas v. Ford Motor Company*, United States· District Court, Central District of

3  California, Case No 2:12-cv-08388 ABC (FFMx), alleged the same or substantially similar

4  material facts on behalf of Plaintiffs as a putative class member as are being alleged by Plaintiffs

5  in the present individual action.

6  93.  The facts alleged in *Vargas v. Ford Motor Company*, United States District Court,

7  Central District of California, Case No 2:12-cv-08388 ABC (FFMx), are substantially similar, if

8  not identical to the facts alleged herein.

9  94.  The allegations in *Vargas v. Ford Motor Company*, United States District Court,

10  Central District of California, Case No 2:12-cv-08388 ABC (FFMx), are based on the same

11  subject matter and similar evidence as the instant Complaint. Those allegations concern the same

12  evidence, memories, and witnesses as the subject matter in the instant Complaint.

13  95.  The *Vargas* class action certainly protected the efficiency and economy of

14  litigation because that class action is protecting the rights of thousands of consumers nationwide

15  through a single action. Consumer class actions regarding defective vehicles brought against

16  manufacturers are regularly certified, making a class action lawsuit an efficient means of pursuing

17  such claims.

18  96.  Plaintiffs acted reasonably and in good faith in filing the instant action. Shortly

19  after discovering Ford's fraudulent behavior, Plaintiffs filed the instant action to pursue their

20  individual rights without delay.

21  97.  The tolling of Plaintiffs' individual statute of limitations encourages the protection

22  of efficiency and economy in litigation as promoted by the class action devise, so that putative

23  class members would not find it necessary to seek to intervene or to join individually because of

24  fear the class might never be certified or putative class members may subsequently seek to request

25  exclusion.

26  98.  The running of all statute of limitations on each of Plaintiffs' claims asserted

27  against Ford in the present-action were therefore tolled by *American Pipe* tolling during the entire

28  pendency of the *Vargas* class action (i.e., from the date on which the *Vargas* class action was filed

CONSUMER LEGAL REMEDIES, APC
1551 Z S North Roxbury Drive, Beverly Hills, CA 90211

18

on September 28, 2012 to the date on which Plaintiffs filed the instant action).

99.   Further, the running of the statute of limitations period applicable to Plaintiffs' fraudulent omission claim continues to be tolled because Ford continues to deny the existence of the Transmission Defect and its duty to disclose it to consumers, including Plaintiffs.

100.   Ford is also equitably estopped from relying on any statute of limitation because of its concealment of the defective nature of the Vehicle and its PowerShift Transmission.

101.   Further, this tolling continued by virtue of Plaintiffs having joined as plaintiffs, after they opted out of the putative *Vargas* class and before the expiration of any applicable limitations period, a state court action in Michigan alleging claims based on the Transmission Defect. (Plaintiffs will voluntarily dismiss, or otherwise terminate their involvement in this Michigan state court action, before proceeding further with this lawsuit.)

### FIRST CAUSE OF ACTION

### BY PLAINTIFFS AGAINST DEFENDANT

### VIOLATION OF SUBDIVISION (D) OF CIVIL CODE SECTION 1793.2

102.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

103.   In connection with the purchase of the Vehicle, Plaintiffs received an express written warranty in which Defendant undertook to preserve or maintain the utility or performance of the Vehicle or to provide compensation if there is a failure in utility or performance for a specified period of time. The warranty provided, in relevant part, that in the event a defect developed with the Vehicle during the warranty period, Plaintiffs could deliver the Vehicle for repair services to Defendant's representative and the Vehicle would be repaired.

104.   During the warranty period, the Vehicle contained or developed defects, including but not limited to: sudden acceleration, delayed acceleration, hesitation on acceleration, difficulty stopping the vehicle, jerking, bucking and kicking, shuddering on acceleration, lack of power, delayed downshifts, transmission fluid leaks, premature wear and/or failure of the Vehicle's transmission control module (TCM), powertrain control module (PCM), and clutch, premature wear of the Vehicle's internal components, and/or any and all

CONSUMER LEGAL REMEDIES, APC
15315 MAGNOLIA BLVD., BEVERLY HILLS, CA 90211

19

1   other defects as delineated in the repair orders. Said defects substantially impair the use, value,

2   or safety of the Vehicle.

3        105.   Defendant and its representatives in this state have been unable to service or

4   repair the Vehicle to conform to the applicable express warranties after a reasonable number of

5   opportunities. Despite this fact, Defendant failed to promptly replace the Vehicle or make

6   restitution to Plaintiffs as required by Civil Code section 1793.2, subdivision (d) and Civil Code

7   section 1793.1, subdivision (a)(2).

8        106.   Plaintiffs have been damaged by Defendant's failure to comply with its

9   obligations pursuant to Civil Code section 1793.2, subdivision (d) and Civil Code section

10   1793.1, subdivision (a)(2), and therefore brings this cause of action pursuant to Civil Code

11   section 1794.

12        107.   Plaintiffs suffered damages in a sum to be proven at trial in an amount that

13   exceeds $25,000.

14        108.   Defendant's failure to comply with its obligations under Civil Code section

15   1793.2, subdivision (d) was willful, in that Defendant and its representative were aware that

16   they were unable to service or repair the Vehicle to conform to the applicable express warranties

17   after a reasonable number of repair attempts, yet Defendant failed and refused to promptly

18   replace the Vehicle or make restitution. Accordingly, Plaintiffs are entitled to a civil penalty of

19   two times Plaintiffs' actual damages pursuant to Civil Code section 1794, subdivision (c).

20        109.   Defendant does not maintain a qualified third-party dispute resolution process

21   which substantially complies with Civil Code section 1793.22. Accordingly, Plaintiffs are

22   entitled to a civil penalty of two times Plaintiffs' actual damages pursuant to Civil Code section

23   1794, subdivision (e).

24        110.   Plaintiffs seek civil penalties pursuant to section 1794, subdivisions (c), and (e)

25   in the alternative and does not seek to cumulate civil penalties, as provided in Civil Code section

26   1794, subdivision (f).

**SECOND CAUSE OF ACTION**

**BY PLAINTIFFS AGAINST DEFENDANT**

**VIOLATION OF SUBDIVISION (B) OF CIVIL CODE SECTION 1793.2**

111.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

112.    Although Plaintiffs presented the Vehicle to Defendant's representative in this state, Defendant and its representative failed to commence the service or repairs within a reasonable time and failed to service or repair the Vehicle so as to conform to the applicable warranties within 30 days, in violation of Civil Code section 1793.2, subdivision (b). Plaintiffs did not extend the time for completion of repairs beyond the 30-day requirement.

113.    Plaintiffs have been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2(b), and therefore brings this Cause of Action pursuant to Civil Code section 1794.

114.    Plaintiffs have rightfully rejected and/or justifiably revoked acceptance of the Vehicle, and have exercised a right to cancel the purchase. By serving this Complaint, Plaintiffs do so again. Accordingly, Plaintiffs seek the remedies provided in California Civil Code section 1794(b)(1), including the entire contract price. In the alternative, Plaintiffs seek the remedies set forth in California Civil Code section 1794(b)(2), including the diminution in value of the Vehicle resulting from its defects. Plaintiffs believe that, at the present time, the Vehicle's value is *de minimis.*

115.    Defendant's failure to comply with its obligations under Civil Code section 1793.2(b) was willful, in that Defendant and its representative were aware that they were obligated to service or repair the Vehicle to conform to the applicable express warranties within 30 days, yet they failed to do so. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiffs' actual damages pursuant to Civil Code section 1794(c).

**THIRD CAUSE OF ACTION**

**BY PLAINTIFFS AGAINST DEFENDANT**

**VIOLATION OF SUBDIVISION (A)(3) OF CIVIL CODE SECTION 1793.2**

116.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

CONSUMER LEGAL REMEDIES, APC

117.    In violation of Civil Code section 1793.2, subdivision (a)(3), Defendant failed to make available to its authorized service and repair facilities sufficient service literature and replacement parts to effect repairs during the express warranty period. Plaintiffs have been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2(a)(3), and therefore brings this Cause of Action pursuant to Civil Code section 1794.

118.    Defendant's failure to comply with its obligations under Civil Code section 1793.2, subdivision (a)(3) was wilful, in that Defendant knew of its obligation to provide literature and replacement parts sufficient to allow its repair facilities to effect repairs during the warranty period, yet Defendant failed to take any action to correct its failure to comply with the law. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiffs' actual damages; pursuant to Civil Code section 1794(c).

**FOURTH CAUSE OF ACTION**

**BY PLAINTIFFS AGAINST DEFENDANT**

**BREACH OF EXPRESS WRITTEN WARRANTY**

**(CIV. CODE, § 1791.2, SUBD. (a); § 1794)**

119.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

120.    In accordance with Defendant's warranty, Plaintiffs delivered the Vehicle to Defendant's representative in this state to perform warranty repairs. Plaintiffs did so within a reasonable time. Each time Plaintiffs delivered the Vehicle, Plaintiffs notified Defendant and its representative of the characteristics of the Defects. However, the representative failed to repair the Vehicle, breaching the terms of the written warranty on each occasion.

121.    Plaintiffs have been damaged by Defendant's failure to comply with its obligations under the express warranty, and therefore brings this Cause of Action pursuant to Civil Code section 1794.

122.    Defendant's failure to comply with its obligations under the express warranty was willful, in that Defendant and its authorized representative were aware that they were obligated to repair the Defects, but they intentionally refused to do so. Accordingly, Plaintiffs

CONSUMER LEGAL REMEDIES, APC

22

**COMPLAINT; JURY TRIAL DEMANDED**

are entitled to a civil penalty of two times of Plaintiffs' actual damages pursuant to Civil Code section 1794(c).

### FIFTH CAUSE OF ACTION

### BY PLAINTIFFS AGAINST DEFENDANT

### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

### (CIV. CODE, § 1791.1; § 1794)

123.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

124.   Pursuant to Civil Code section 1792, the sale of the Vehicle was accompanied by Defendant's implied warranty of merchantability. Pursuant to Civil Code section 1791.1, the duration of the implied warranty is coextensive in duration with the duration of the express written warranty provided by Defendant, except that the duration is not to exceed one-year.

125.   Pursuant to Civil Code section 1791.1 (a), the implied warranty of merchantability means and includes that the Vehicle will comply with each of the following requirements: (1) The Vehicle will pass without objection in the trade under the contract description; (2) The Vehicle is fit for the ordinary purposes for which such goods are used; (3) The Vehicle is adequately contained, packaged, and labelled; (4) The Vehicle will conform to the promises or affirmations of fact made on the container or label.

126.   At the time of purchase, or within one-year thereafter, the Vehicle contained or developed the defects set forth above. The existence of each of these defects constitutes a breach of the implied warranty because the Vehicle (1) does not pass without objection in the trade under the contract description, (2) is not fit for the ordinary purposes for which such goods are used, (3) is not adequately contained, packaged, and labelled, and (4) does not conform to the promises or affirmations of fact made on the container or label.

127.   Plaintiffs have been damaged by Defendant's failure to comply with its obligations under the implied warranty, and therefore bring this Cause of Action pursuant to Civil Code section 1794.

CONSUMER LEGAL REMEDIES, APC
15312 SOUTH MASSOCIATION, BEVERLY HILLS, CA 90211

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ROXBURY DRIVE, BEVERLY HILLS, CA 90211

## SIXTH CAUSE OF ACTION

## BY PLAINTIFFS AGAINST DEFENDANT FORD MOTOR COMPANY

### (Fraudulent Inducement – Intentional Misrepresentation)

128.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

129.   Ford drafted, produced, and distributed marketing brochures to the public containing factual representations about the PowerShift Transmission. Ford's marketing brochure for the Vehicle represented that the PowerShift Transmission had the following qualities:

a.   "A PowerShift 6-speed automatic delivers torque to the wheels 100% of the time during shifts, supplying excellent responsiveness."

130.   Unfortunately, the Vehicle as delivered to Plaintiffs had extremely poor handling on all roads, as Plaintiffs' drive was repeatedly interrupted by jerky shifts and hesitation. Plaintiffs' Vehicle was also not equipped with an "automatic" transmission, contrary to Ford's suggestion that the transmission is a traditional "automatic." Plaintiffs' Vehicle in fact contained an unproven automated dual clutch manual transmission. Plaintiffs' Vehicle did not have seamless gear changes - it experienced jerky gear changes and hesitation between shifts, which necessitated several repairs and repeated reprogramming of the transmission control module - none of which were sufficient to resolve the Transmission Defect.

131.   Ford made such representations regarding the PowerShift Transmission in the 2013 Ford Fiesta despite its extensive internal knowledge of the Transmission Defect and other problems. Ford's knowledge of the Transmission Defect is laid out in detail in paragraphs 44-51.

132.   Ford informed its dealers and authorized service facilities and personnel, about common behavior characteristics of the PowerShift Transmission in July 2011. In a memo with instructions sent to Ford dealers and authorized service personnel, Ford noted that some of the common characteristics of the PowerShift Transmission include double clicking metal sounds, coast down whine, low speed grinding, and reverse gear whine. Despite this admission by Ford to its dealers, repair facilities, and agents, Ford continued to represent to the public that the PowerShift Transmission offered "great handling on all roads," and "the performance of a

24

manual," and "seamless gear changes for amazing responsiveness," - a wildly different picture from the reality. Ford made the statements in its marketing brochures recklessly and without regard for their truth.

133. In addition, Ford misrepresented the type of transmission equipped in the Vehicle. Throughout its marketing brochure, Ford states that the Vehicle is equipped with a 6-speed automatic transmission. That representation is false. The Vehicle is actually equipped with the Ford PowerShift Transmission, which is in fact a dual clutch transmission, which operates using direct mechanical engagement and disengagement similar to a manual transmission. This information is material for a consumer to know in making a purchasing decision, because unlike a traditional automatic transmission, Ford's PowerShift dual clutch transmission powers the drive wheels through a clutch, rather than a torque converter. The use of a clutch can result in a substantially jerkier ride than that produced using a torque converter, particularly in an unproven design. Plaintiffs would not have purchased the Vehicle had they known the Vehicle's transmission technology would cause the drive to be jerky, unreliable, and dangerous as a result of the unproven dual-clutch (rather than automatic) system.

134. Defendants intended that Plaintiffs rely on the representations made in the marketing brochure related to the transmission in inducing Plaintiffs to purchase the Vehicle.

135. Plaintiffs reasonably relied on Defendant's representations related to the transmission being "automatic" and providing a smooth ride because Ford was the manufacturer of the Vehicle and claimed to have performed and relied upon extensive pre-release testing of the PowerShift Transmission. Ford was in a superior position of knowledge.

136. Plaintiffs were harmed by purchasing a vehicle that they would not have purchased had they known the true facts about the PowerShift Transmission and the Transmission Defects affecting it.

137. Plaintiffs' reliance on Defendants' representations about the transmission qualities was a substantial factor in Plaintiffs' harm, as Ford and its agents were the exclusive source of information about the qualities of the transmission.

CONSUMER LEGAL REMEDIES, APC
1531 I-25 NORTH 10655-23 DRIVE, BEVERLY HILLS CA 90211

# SEVENTH CAUSE OF ACTION

## BY PLAINTIFFS AGAINST DEFENDANT FORD MOTOR COMPANY

### (Fraud by Omission)

138.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

139.    Ford committed fraud by allowing to be sold to Plaintiffs the Vehicle without disclosing that the Vehicle and its PowerShift Transmission were defective and susceptible to sudden and premature failure.

140.    In particular, Plaintiffs are informed, believe, and thereon allege that prior to Plaintiffs acquiring the Vehicle, Ford was well aware and knew that the PowerShift Transmission installed on the Vehicle was defective but failed to disclose this fact to Plaintiffs at the time of sale and thereafter.[1]

141.    Specifically, Ford knew or should have known that the PowerShift Transmission had the "Transmission Defect." The Transmission Defect presents a safety hazard and is unreasonably dangerous to consumers because it can suddenly and unexpectedly affect the driver's ability to control the vehicle's speed, acceleration, and deceleration.

142.    Plaintiffs are informed, believe, and thereon allege that Ford acquired its knowledge of the Transmission Defect prior to Plaintiffs acquiring the Vehicle, through sources not available to consumers such as Plaintiffs, including but not limited to pre-production and post-production testing data, early consumer complaints about the Transmission Defect made directly to Ford and its network of dealers, aggregate warranty data compiled from Ford's network of dealers, testing conducted by Ford in response to these complaints, as well as warranty repair and part replacements data received by Ford from Ford's network of dealers, amongst other sources of internal information.

143.    Plaintiffs are informed, believe, and thereon allege that while Defendant Ford Motor Company knew about the Transmission Defect, and its safety risks since 2010, if not

---

[1] Indeed, Ford has issued various technical bulletins to its dealers (not consumers) concerning the defective PowerShift Transmission as outlined in more detail, *supra*.

CONSUMER LEGAL REMEDIES, APC
15512 NORTH ARDSON DRIVE, BEVERLY HILLS, CA 90211

before, Ford nevertheless concealed and failed to disclose the defective nature of the Vehicle and its PowerShift Transmission to Plaintiffs at the time of sale and thereafter. Had Plaintiffs known that the Vehicle suffered from the Transmission Defect, they would not have purchased the Vehicle.

144.    Indeed, Plaintiffs allege that Ford knew that the Vehicle and its PowerShift Transmission suffered from an inherent defect, was defective, would fail prematurely, and was not suitable for its intended use.

145.    Ford was under a duty to Plaintiffs to disclose the defective nature of the Vehicle and its PowerShift Transmission, its safety consequences and/or the associated repair costs because:

a.    Ford acquired its knowledge of the Transmission Defect and its potential consequences prior to Plaintiffs acquiring the Vehicle, though sources not available to consumers such as Plaintiffs, including but not limited to pre-production testing data, early consumer complaints about the Transmission Defect made directly to Ford and its network of dealers, aggregate warranty data compiled from Ford's network of dealers, testing conducted by Ford in response to these complaints, as well as warranty repair and part replacements data received by Ford from Ford's network of dealers, amongst other sources of internal information;

b.    Ford was in a superior position from various internal sources to know (or should have known) the true state of facts about the material defects contained in vehicles equipped with PowerShift Transmission; and

c.    Plaintiffs could not reasonably have been expected to learn or discover of the Vehicle's Transmission Defect and its potential consequences until well after Plaintiffs purchased the Vehicle.

146.    In failing to disclose the Transmission Defect to Plaintiffs, Ford has knowingly and intentionally concealed material facts and breached its duty not to do so.

147.    The facts concealed or not disclosed by Ford to Plaintiffs are material in that a reasonable person would have considered them to be important in deciding whether or not to

27

CONSUMER LEGAL REMEDIES, A PC
1531 7 2 NORTH ARCSOI 300S, BEVERLY HILLS CA 90211

1   purchase or lease the Vehicle. Had Plaintiffs known that the Vehicle and its transmission were

2   defective at the time of sale, they would not have purchased the Vehicle.

3       148.    Plaintiffs are reasonable consumers who do not expect their transmission to fail

4   and not work properly. Plaintiffs further expect and assume that Ford will not sell or lease

5   vehicles with known material defects, including but not limited to those involving the vehicle's

6   transmission, and will disclose any such defect to its consumers before selling such vehicles.

7       149.    As a result of Defendant Ford Motor Company's misconduct, Plaintiffs have

8   suffered and will continue to suffer actual damages.

9                                   **PRAYER**

10  PLAINTIFFS PRAY for judgment against Defendant as follows:

11      a.      For Plaintiffs' actual damages in an amount according to proof;

12      b.      For restitution;

13      c.      For a civil penalty in the amount of two times Plaintiffs' actual damages

14              pursuant to Civil Code section 1794, subdivision (c) or (e);

15      d.      For any consequential and incidental damages;

16      e.      For costs of the suit and Plaintiffs' reasonable attorneys' fees pursuant to Civil

17              Code section 1794, subdivision (d);

18      f.      For any remedies pursuant to the Song-Beverly Act, the California Uniform

19              Commercial Code and/or any other remedy that the Court deems proper;

20      g.      For prejudgment interest at the legal rate;

21      h.      For punitive damages; and,

22      i.      For such other relief as the Court may deem proper.

23

24  / / /

25

26  / / /

27

28

COMPLAINT; JURY TRIAL DEMANDED

CONSUMER LEGAL REMEDIES, APC
1551/25 North Harbor Blvd, Beverly Hills, CA 90211

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action asserted herein.

Dated: April 30, 2018                    CONSUMER LEGAL REMEDIES, APC

BY: _____
                    MICHAEL D. RESNICK
                    Attorney for Plaintiffs,
                    RYAN WALSH and JOHN WALSH

**COMPLAINT; JURY TRIAL DEMANDED**